**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUL CREIGHTON, an individual,<br><br>                              Plaintiff,<br><br>          v.<br><br>CITY OF LIVINGSTON, a California<br>Municipal Corporation, RICHARD<br>WARNE, an individual and in his<br>official capacity, and DOES 1-20,<br>inclusive,<br><br>                         Defendants. | 1:08-CV-01507-OWW-SMS<br><br>MEMORANDUM DECISION AND<br>ORDER ON DEFENDANTS' MOTION<br>FOR PARTIAL JUDGMENT ON THE<br>PLEADINGS, OR<br>ALTERNATIVELY, MOTION TO<br>DISMISS FOR FAILURE TO<br>STATE A CLAIM (DOC. 10) |

## I.  INTRODUCTION

Plaintiff Paul Creighton ("Creighton") filed suit against his former employer, the City of Livingston, and former supervisor, Richard Warne (collectively "Defendants"), on September 2, 2008 in the Superior Court of California, County of Merced.  On October 6, 2008, Defendants removed the action to this court based on federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.  (Doc. 1, attaching Plaintiff's complaint as exhibit "A" and Defendants' answer as exhibit "B".)

Plaintiff alleges violations of his First and Fourteenth Amendment rights under 42 U.S.C. § 1983.  Plaintiff also asserts supplemental claims, including violation of article I, §§ 2 and 3 of the California Constitution, various California Labor Code violations, and wrongful termination in violation of public policy.  (Doc. 1, Exhibit A at 12-17.)

1

Before the court for decision is Defendants' motion for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), or alternatively, to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (Doc. 10, filed Dec. 9, 2008.)

Defendants challenge the § 1983 claim by asserting that: (1) Plaintiff's *Monell* claim fails because he does not allege that a policy, custom, or practice of the City of Livingston caused his constitutional injury, and (2) Richard Warne, the City Manager, is entitled to qualified immunity because a) Plaintiff's speech is not entitled to constitutional protection as it was made pursuant to his professional responsibilities, and b) the right at issue was not clearly established at the time of the alleged violation. As to the California claims, Defendants argue that: (1) no private right of action for damages exists under the California Constitution; (2) Plaintiff has failed to allege administrative exhaustion with the California Labor Commissioner as required under California Labor Code § 98.6 and § 1102.5 ; (3) California Labor Code § 6310 does not apply to the facts of this case; and (4) California's Tort Claims Act bars Plaintiff's

---

[1] "A Rule 12(b)(6) motion must be made *before* the responsive pleading." *MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006) (quoting *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954 (9th Cir. 2004)) (internal quotations and citations omitted) (emphasis in original). Because Defendants filed their answer on October 1, 2008, Defendants' Rule 12(b)(6) motion was made *after* they filed their answer to the complaint. Defendants' Rule 12(b)(6) motion is untimely and will not be considered. The only proper motion before the court is Defendants' Rule 12(c) motion. *See id.*

wrongful termination in violation of public policy claim.

## II. <u>BACKGROUND</u>

Plaintiff served as Defendant City of Livingston's (the "City" or "Livingston") Public Works Director from June 2004 to June 6, 2008. (Compl. ¶ 5-6.) In conjunction with his duties as Public Works Director, Plaintiff served as Acting City Manager from the start of his employment to May 2005. (Compl. ¶¶ 7-8.) Plaintiff alleges that his employment record was "discipline-free" and reflected "favorable performance evaluations and merit increases." (Compl. ¶ 9.)

Plaintiff alleges that around late 2005 or early 2006, Defendant Richard Warne ("Warne") became Livingston's City Manager. (Compl. ¶ 10.) As City Manager, Warne managed City funds and department budgets. (*Id.*) During Warne's tenure, the City was involved in the Proposition 13 Water Line Replacement Project, a publicly-funded project. (Compl. ¶ 12.) While managing this project, Plaintiff contends that Warne pressured him to "approve multiple change orders that appeared to benefit current and former City officials and/or persons linked to them." (*Id.*) Plaintiff questioned Warne's motives and the need for the change orders, explaining to Warne that the orders would adversely affect the budget. (*Id.*) Still, Warne took steps to have the change orders approved. (*Id.*)

Among Warne's responsibilities as City Manager was management of Livingston's Water Enterprise Fund ("WEF"), which is used to operate and maintain the City's water system. (Compl. ¶ 10.) Plaintiff had previously managed the WEF as Acting City

3

Manager.  (Compl. ¶ 11.)  Plaintiff alleges that under Warne's management the WEF "was being depleted and that there appeared to be accounting discrepancies and inexplicable shifting monetary allocations."  (*Id.*)  When Plaintiff brought his concerns to Warne's attention, Plaintiff contends that Warne instructed him to "disregard those matters."  (*Id.*)

To replenish the depleted water funds and ensure the City's ability to safely manage its water supply, Plaintiff asserts that a water rate study was needed to commence the process to approve and secure rate increases.  (Compl. ¶ 13.)  Warne hired an outside consultant to prepare the initial water rate study, which was completed in 2006.  (Compl. ¶ 14.)  Plaintiff contends the study was "forced to undergo significant changes," delaying completion of the study until early 2008.  (*Id.*)  Plaintiff alleges that while the water rate study was being conducted, Plaintiff informed  Warne on multiple occasions that the study needed to be submitted to the public and Livingston's City Council for approval.  (Compl. ¶ 15.)  Plaintiff contends that his "pleas" were ignored because Warne wanted to submit the water rate study after Livingston's City Council elections in November 2008.  (*Id.*)

In January 2008, Plaintiff discovered that one of the City's water wells was polluted with Coliform bacteria.  (Compl. ¶ 16.)  This posed potential health problems for Livingston residents and users of the City water supply.  (Compl. ¶ 17.)  Plaintiff shut down the polluted well, temporarily controlling the problem.  (Compl. ¶ 16.)  Plaintiff contends that he was able to shut down the well because the contamination occurred in January, which is

**4**

not peak water use season.  (Compl. ¶ 16.)  However, if the problem arose during peak water use season, the well could not be shut down because the City would face dangerously low water pressure, backflow issues, and other public health risks. (Compl. ¶ 17.)  Plaintiff determined that the public health risks posed by the polluted well could be ameliorated by drilling a new well on an emergency basis.  (*Id.*)  However, the City's shortage of funds and the delay in obtaining additional funds caused by Warne's withholding of the water rate study put Plaintiff's plan for a new well on hold.  (*Id.*)

Plaintiff continued to request that Warne submit the study for approval due to the public health and safety risks.  (Compl. ¶ 18.)  Warne continued to refuse, telling Creighton that the study would not be submitted until local elections occurred and that he should not concern himself with the study.  (*Id.*)  In May 2008, which is peak water season, the polluted water well again tested positive for Coliform bacteria.  (Comp. ¶ 19.)  Plaintiff informed Warne about the positive test results, telling him about the potential need for a well shut-down and the associated health risks.  (Compl. ¶ 20.)  Plaintiff believed serious health problems would result if the polluted well was shut down without first adding a new well.  (Compl. ¶ 19.)  Warne became angry and warned Plaintiff to keep quiet about the situation.  (Compl. ¶ 20.)  Plaintiff contends that Warne again refused to submit the water rate study until after local elections despite knowing about the polluted well.  (Compl. ¶ 18.)  Plaintiff was unable to shut down the well because it was now peak water season.  (Compl. ¶ 19.)

5

Plaintiff believed that Warne "was ignoring, and exacerbating, a serious potential health hazard." (Compl. ¶ 21.) Acting on this belief, Plaintiff raised the issues of the polluted well problem, the health risks it posed, and Warne's plan to delay submission of the water rate study with the City's Mayor Pro Tem and Councilmember William Ingram and Councilmember Rodrigo Espinoza. (*Id.*) Plaintiff alleges that these discussions "occurred at non-Livingston owned property, during off-duty time and were not part of [Plaintiff's] Public Works Director duties." (*Id.*) Plaintiff also alleges that Warne learned of these discussions, summoned Plaintiff to his office without prior notice, and fired Plaintiff without any explanation. (Compl. ¶ 23.) When Plaintiff asked for a reason, Warne said he was "taking the City in a different direction." (*Id.*)

### III. <u>STANDARD OF DECISION</u>

A motion for judgment on the pleadings, pursuant to Federal Rules of Civil Procedure Rule 12(c), challenges the legal sufficiency of the opposing party's pleadings after the pleadings are closed. Judgment on the pleadings is appropriate when, taking all of the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law. *Honey v. Distelrath,* 195 F.3d 531, 532 (9th Cir. 1999) (citing *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)). The court must assume the truthfulness of the material facts alleged in the complaint. All inferences reasonably drawn from these facts must be construed in favor of the responding party.

*Westlands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 670 (9th Cir. 1993). In addition, all allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988). Where the allegations of the moving party have been denied by the non-moving party, those allegations are assumed to be false. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir. 1990) (citing *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984)). If matters outside of the pleadings are considered by the court on a motion for judgment on the pleadings, the motion shall be treated as one for summary judgment. *Hal Roach Studios, Inc.*, 896 F.2d at 1550; Fed. R. Civ. P. 12(c).

## IV. DISCUSSION

### A. Section 1983 Claim

Plaintiff's first cause of action alleges violation of 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Plaintiff alleges that Defendants violated his First and Fourteenth Amendment rights by terminating his employment after he discussed his concerns regarding the polluted well and water

7

rate study with the City's council members.  (Compl. ¶¶ 6, 7.)
Plaintiff claims that Defendants' conduct in terminating his
employment amounts to retaliation for exercising his First
Amendment rights.  (Compl. ¶ 7.)

Livingston contends that the § 1983 claim asserted against
it fails because Plaintiff has not alleged that his
constitutional rights were violated pursuant to a City custom,
policy, or practice.  (Doc. 10 at 15.)  Defendants contend that
the claim also fails because Warne is entitled to qualified
immunity because: 1) the speech Plaintiff engaged in was not
constitutionally protected, and 2) the right was not clearly
established at the time of the alleged violation.  (Doc. 10 at
18.)

### 1. *Monell Claim*

Livingston argues that Plaintiff's § 1983 claim against the
City fails because Plaintiff has failed to allege facts
establishing that his injury was a result of Livingston's
customs, policy, or practice.

> A local government may not be sued under § 1983 for an
> injury inflicted solely by its employees or agents.
> Instead, it is when execution of a government's policy
> or custom, whether made by its lawmakers or by those
> whose edicts or acts may fairly be said to represent
> official policy, inflicts the injury that the
> government as an entity is responsible under § 1983.

*Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658,
694 (1978).

To prevail in a civil rights claim against a local
government under *Monell*, a plaintiff must satisfy a three-part
test:

(1)  The local government official(s) must have
         intentionally violated the plaintiff's constitutional
         rights;

    (2)  The violation must be a part of policy or custom and
         may not be an isolated incident; and

    (3)  There must be a link between the specific policy or
         custom to the plaintiff's injury.

*Id.* at 690-92.

There are a number of ways to prove a policy or custom of a municipality.  A plaintiff may show (1) "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "the official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).  The Ninth Circuit recognizes that a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."  *Id.*

Plaintiff has not pled the existence of any unconstitutional policy, nor alleged any custom or pattern of activity on the part of the City of Livingston.  Plaintiff, however, argues that he "does not need to show a formal policy and, instead, he . . . can show that it was the result of a deliberate decision by an official, or officials, with final policymaking authority."  (Doc. 15 at 9.)

A municipality may be liable under *Monell* for a single

**9**

incident where: (1) the person causing the violation has "final policymaking authority;" (2) the "final policymaker" "ratified" a subordinate's actions; or (3) the "final policymaker" acted with deliberate indifference to a subordinate's constitutional violations. *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).

Moreover, Plaintiff contends that he has alleged sufficient facts in light of *Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621, 624 (9th Cir. 1988), which determined:

> [A] claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss 'even if the claim is based on nothing more than a <u>bare allegation</u> that the individual officers' conduct conformed to official policy, custom, or practice.'

(quoting *Shah v. County of L.A.*, 797 F.2d 743, 747 (9th Cir. 1986)) (emphasis added).

However, in this case, Plaintiff fails to meet even the threshold requirement of a "bare allegation." The complaint does not refer to any custom, policy, or practice of the City, nor does it allege that Warne had any final policymaking authority under *Christie*. It is only Plaintiff's opposition that asserts that the *Monell* claim can be based on a showing that "it was the result of a deliberate decision by an official, or officials, with final policymaking authority." (Doc. 15 at 9.) Even then, Plaintiff identifies no policymaker or command-level decision or ratification. Because Plaintiff's *Monell* allegations are non-existent or unclear, Defendant Livingston's motion for partial judgment on the pleadings as to Plaintiff's *Monell* claim is GRANTED WITH LEAVE TO AMEND.

## 2. *Qualified Immunity*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine grows out of the policy concern that few individuals would enter public service if they risked personal liability for their official decisions. *Harlow*, 457 U.S. at 814. The immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), and "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Pearson*, 129 S. Ct. at 815 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004). Recently in *Pearson v. Callahan*, the Supreme Court modified the two-step sequence for resolving government officials' qualified immunity claims that it set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). *See Pearson*, 129 S. Ct. at 818; *Tortu v. Las Vegas Police Dep't*, 556 F.3d 1075, 1085 n.7 (9th Cir. 2009). Under *Saucier*, courts were required to undertake a two-part inquiry in

11

determining whether a government official was entitled to qualified immunity. *Saucier*, 533 U.S. at 201. First, a court examined whether the facts that a plaintiff alleged showed the government officer's conduct violated a constitutional right. *Id.* at 201. Second, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 129 S. Ct. at 816 (citing *Saucier*, 533 U.S. at 201). In *Pearson*, the Supreme Court held that the two-step sequence is no longer a mandatory "inflexible requirement" in which step one must be considered before step two. *Id.* at 813. Rather, district courts have discretion to determine the order in which these inquiries take place. *Id.* at 818. The first inquiry is a question of fact and the second is a question of law. *Tortu*, 556 F.3d at 1085.

### a. *Is There A Constitutional Violation?*

Defendants argue Plaintiff did not engage in constitutionally protected speech because he spoke as a City employee pursuant to his official duties, not as a private citizen. (Doc. 10 at 13.) Plaintiff disagrees, arguing he spoke as a citizen when he complained to two Livingston council members about public health and safety risks he believed were posed by the polluted well and Warne's delay in submitting the water rate study for approval. (Doc. 15 at 8-9.)

To sustain a First Amendment retaliation claim, a public employee must show that:

> (1) the employee engaged in constitutionally protected speech, (2) the employer took adverse employment action against the employee, and (3) the employee's speech was

> a substantial or motivating factor in the adverse action.

*Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (quoting *Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006)) (internal quotations omitted).

Defendants contend Plaintiff cannot establish the first element of his First Amendment retaliation claim – that he engaged in constitutionally protected speech. Defendants do not attack the sufficiency of Plaintiff's claim with respect to the other two elements. Under the first element of the test:

> the employee must demonstrate that (1) he spoke on a matter of public concern, and (2) as a private citizen, and if this is established, then the burden shifts to the public employer to show that (3) under the *Pickering* balancing test, the government's legitimate administrative interests outweigh the employee's First Amendment rights.

*See Gibson v. Office of the Attorney Gen.,* 554 F.3d 759, 764 (9th Cir. 2009); *Garcetti*, 547 U.S. at 418; *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009); *Posey*, 546 F.3d at 1126.

### 1) Matter of Public Concern

First, Defendants do not challenge Plaintiff's assertion that he spoke on a matter of public concern. Generally, "[s]peech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1070 (quoting *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 422 (9th Cir. 1995)) (internal quotations omitted); *see also Connick v. Myers*, 461 U.S. 138, 146 (1983). Speech involving "individual personnel disputes and grievances" is generally not of public concern.

13

*Eng*, 552 F.3d at 1070.  Whether an employee's speech addresses a matter of public concern is "determined by the content, form, and context of a given statement."  *Id.* (quoting *Johnson*, 48 F.3d at 422) (internal quotations omitted).

Here, Plaintiff alleges he spoke to two Livingston council members regarding public health and safety concerns relating to the polluted city water well and Warne's alleged mismanagement and waste of the WEF fund, general inefficiency as City Manager, and improper (and presumably unethical) decision to delay submission of the water rate study until after local elections were held.

With respect to Plaintiff expressing public health and safety concerns due to the polluted well, the Ninth Circuit has held that speech involving public safety issues is clearly a matter of political, social, or other concern to the community. *See Posey*, 546 F.3d at 1130; *Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999).  In *Posey*, a high school security officer wrote a letter to the school district's administrative officer complaining of inadequate safety and security policies at the school.  546 F.3d at 1124.  The Ninth Circuit found that "whether fires had occurred in school buildings without proper student evacuation, and whether students had brought deadly weapons onto school premises" were matters that would be "of great importance to any community concerned with the safety of its school children."  *Id*. at 1130.  The letter was "*unquestionably related* to issues of political, social, or other concern to the community sufficient to satisfy the First Amendment."  *Id*. (emphasis added).  In *Gilbrook*, 177 F.3d at 866,

**14**

a firefighter's statement to the press expressing his opinion
that the city council's budget cuts had undermined the fire
department's ability to fight fires and protect lives was found
to be a matter of public concern: "[i]n our view, an opinion
about the preparedness of a vital public-safety institution, such
as a fire department, goes to the core of what constitutes speech
on matters of public concern."  There is little doubt that
Plaintiff's statements to the council members regarding the
safety issues posed by the polluted well - a threat to the health
of the entire community - constituted speech on a matter of
public concern.

Moreover, "misuse of public funds, wastefulness, and
inefficiency in managing and operating government entities are
matters of inherent public concern."  *Johnson,* 48 F.3d at 425
(citing *Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401,
1405 (9th Cir. 1988)).  Matters of public concern including those
that relate to the functioning of government and are relevant to
the public's evaluation of the performance of governmental
agencies merit the highest degree of First Amendment protection.
*See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.
2003); *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.
1983).  Plaintiff's statements regarding Warne's misuse and
mismanagement of the WEF and general wastefulness and
inefficiency are inherent matters of public concern.  *See
Freitag*, 468 F.3d at 545 (speech concerning prison
administrator's mismanagement was of public concern); *Roth*, 856
F.2d at 1406 (speaking out "for the express purpose of addressing
management and operational problems besetting the [Veteran's

15

Administration]" is a matter of public concern).  Additionally, corruption allegations like Plaintiff's accusations that Warne was delaying the water rate study for an improper and unethical political purpose have "all of the hallmarks that we normally associate with constitutionally protected speech."  *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007).  Plaintiff's statements are clearly related to the functioning of the City of Livingston and contain relevant information for a citizen to evaluate the performance of Livingston's departments and agencies.  As such, they involve matters of public concern.

## 2) <u>As A Citizen</u>

Second, the plaintiff must allege that he spoke as a private citizen and not as a public employee.  To qualify as constitutionally protected speech, the employee "must have uttered the speech as a citizen" and not "pursuant to their official duties."  *Marable*, 511 F.3d at 929 (citing *Garcetti*, 547 U.S. at 421).  This is a mixed question of fact and law.  "While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law."  *Eng*, 552 F.3d at 1071 (citing *Posey*, 546 F.3d at 1129-31) (internal quotations omitted).  "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements or if the speech was not the product of performing the tasks the employee was paid to perform."  *Posey*, 546 F.3d at 1127 n.2.

Plaintiff alleges his discussions with the council members

**16**

about Warne and the polluted water well occurred "at non-Livingston owned property, during off-duty time and were not part of [his] Public Works Director duties."  (Compl. ¶ 21).  There is no indication that Plaintiff had an official duty to report his concerns to the council members or that in doing so he was performing a task for which he was paid.  Plaintiff was not a direct reporter to the council members.  The allegations suggest that, in fact, Plaintiff went around Warne to report to the council members after repeatedly raising his concerns with Warne. Plaintiff asserts that he informed the council members of his concerns for public health and safety after Warne ignored his pleas and, in Plaintiff's view, exacerbated the health risks involved.

Plaintiff's speech is similar to that of the female corrections officer in *Freitag*, 468 F.3d at 545, where the Ninth Circuit determined that the officer's letters to her state senator concerning sexual harassment in the prison where she worked were written as a private citizen.  The court reasoned that the officer's right to complain to an elected public official "is guaranteed to any citizen in a democratic society regardless of his status as a public employee" and her communication "bore similarities to letters submitted by numerous citizens every day."  *Id*.  It was not part of the officer's official tasks to complain to the senator but was her "responsibility *as a citizen* to expose such official malfeasance to broader scrutiny."  *Id*. (emphasis in original).  Here, Plaintiff's complaints to the two council members are analogous to complaints citizens regularly lodge with their elected

officials.

Defendants argue that Plaintiff was directly responsible for well contamination issues and that because the water rate study impacted the resolution of the contamination issue, it was also within Plaintiff's professional duties as Public Works Director. (Doc. 10 at 13-14.) First, with respect to the water study and fund, the complaint expressly alleges that Warne was responsible for the water study and that he managed the WEF at the time of the speech at issue. Second, the fact that Plaintiff's speech concerned the subject matter of his employment is not dispositive, as the First Amendment protects some expressions related to the speaker's job. *Garcetti*, 547 U.S. at 421. *Garcetti* cited *Pickering's* observation that teachers are the community members "most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id*. (internal quotations and citations omitted). *Garcetti* noted the same is true of many other categories of public employees. *Id*.; *see also San Diego v. Roe*, 543 U.S. 77, 82 (2004) ("Public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.") (citation omitted).

18

Third, Defendants' arguments regarding the scope of Plaintiff's job responsibilities cannot conclusively establish as a matter of law that Plaintiff's statements were made as a City employee pursuant to his professional responsibilities. At most, in light of the allegations of the complaint and the fact that the scope of job duties is a question of fact, Defendants raise disputed factual issues that preclude judgment on the pleadings under Rule 12(c).

Defendants also argue that the gravamen of Plaintiff's communication with the council members concerned his grievances as an employee about conflicts with his supervisor, which is not entitled to constitutional protection. *See Connick*, 461 U.S. at 154 (while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance"). But Plaintiff's allegations did not concern the "minutiae of workplace grievances." *Havekost v. U.S. Dep't of the Navy*, 925 F.2d 316, 319 (9th Cir. 1991) (finding speech of a grocery bagger employed by Naval Station's commissary expressing her objections to the new employee dress code and a proposed increase in the number of baggers per shift did not relate to a matter of public concern). They are unlike the dispute in *Connick*, where an employee slated to be transferred to another section distributed a questionnaire to fellow employees regarding the office's transfer policy, morale, need for a grievance committee and other matters that the court held were "matters only of personal interest." *Connick*, 461 U.S. at 147. Plaintiff's allegations concerned the functioning of the Livingston municipal government and safety of a City well, not

19

internal office affairs or personnel disputes.

Finally, Defendants contend that Plaintiff did not act as a private citizen because he did not publicly expose his concerns. This argument fails. In holding that a public employee does not forfeit his free speech rights because he expresses his views privately rather than publicly, the Supreme Court stated: "Neither the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979); *see Ulrich v. City and County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) ("Although there is no evidence that [the public employee] expressed his views to the press or representatives of the public at large, this does not defeat his claim.").

Plaintiff's complaint sufficiently pleads that he spoke as a citizen to withstand a Rule 12(c) motion.


### 3) *Pickering* balancing test

Third, once the first two elements establish that a public employee spoke as a citizen on a matter of public concern, the next inquiry applies the *Pickering* balancing test. Defendants argue that the *Pickering* factors weigh in favor of Livingston's interests. (Doc. 10 at 19-21.) The *Pickering* balancing test entails striking "a balance between the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs

through its employees." *Pickering v. Bd of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Here the burden shifts to the government employer to show that "the [government's] legitimate administrative interests outweigh the employee's First Amendment rights." *Eng*, 552 F.3d at 1071 (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)). The *Pickering* inquiry asks:

> whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Eng,* 552 F.3d at 1071 (quoting *Garcetti*, 547 U.S. at 418). "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Garcetti*, 547 U.S. at 418.

None of the allegations in the complaint demonstrate that Plaintiff's speech in any way "so severely damaged office harmony and working relationships that the government's interest in promoting an effective workplace outweighs [the employee's] First Amendment rights." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992). This case is at the pleading stage so Defendants offer no evidence of inefficiency or disruption in the workplace. "The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be." *Id.* Because Plaintiff's statements concerned the functioning of government and public health and safety issues, they are entitled to the highest degree of First Amendment protection.

Defendants argue that Plaintiff's "alleged statements would have definitely disrupted and eroded Plaintiff's working

relationship" with Warne and would create distrust.  (Doc. 10 at
20-21.)  But Defendants must show more than mere disruption.
*Johnson*, 48 F.3d at 427.  They "must show actual injury" to
legitimate interests.  *Id*.  In a whistleblowing situation like
this, the government "does not have a legitimate interest in
covering up mismanagement or corruption and cannot justify
retaliation against whistleblowers as a legitimate means of
avoiding the disruption that necessarily accompanies such
exposure."  *Id.*  Moreover, Defendants' allegations are only of
the *potential* for disturbance to the workplace, compared to the
strong free speech interest in Plaintiff's speech that concerned
public health and safety and the proper functioning of
government.

       Taking Plaintiff's allegations as true, at this stage of the
case Defendants have not met their burden under *Pickering* to show
that their interest in workplace efficiency outweighs Plaintiff's
free speech interest to defeat his claim.  Having determined that
Plaintiff has sufficiently alleged that he spoke as a citizen on
a matter of public concern, his complaint states a cognizable
First Amendment retaliation claim.


              b.    *Is the Law Clearly Established*?

       Defendants argue it is not clearly established that the
speech in which Plaintiff engaged is constitutionally protected.
Citing *Brewster*, Defendants contend that because under *Pickering*,
the speech determination is "fact-sensitive" and "context-
specific," the law regarding public employee free speech
retaliation claims will rarely be clearly established to preclude

qualified immunity.  *Brewster v. Board of Education*, 149 F.23d 971, 979-80 (9th Cir. 1998).

However, there is a series of cases in the Ninth Circuit establishing that "the public's interest in learning about illegal conduct by public officials and other matters at the core of First Amendment protection outweighs a state employer's interest in avoiding a mere *potential* disturbance to the workplace."  *Keyser v. Sacramento City Unified Schools*, 265 F.3d 741, 748 (2001) (emphasis in original).  In *Gilbrook*, the Ninth Circuit held it was clearly established that it would violate the First Amendment to fire several firefighters who had public criticized the city's preparedness for fires.  177 F.3d at 867-70.  Because there was no evidence of actual disruption in the workplace or fire services, the court concluded that the "nominal showing of potential disruption is plainly inadequate to outweigh the heavy interests" of the firefighter in speaking out about fire preparedness and of citizens in receiving such information. *Id.* at 869.  In *Keyser*, where the court held it was clearly established that the *Pickering* balancing test favored the employees, there was no evidence of any actual disruption in the workplace but the defendant speculated that the speech at issue must have significantly disrupted the school district.  265 F.3d at 749.  Here too there is no such evidence or even allegation, only speculation regarding the potential for disruption.

Defendants argue *Brewster* establishes that because the *Pickering* test requires context-specific balancing, the law regarding free speech retaliation claims will rarely if ever be

clearly established to preclude qualified immunity.  But *Keyser*

explains that *Brewster* is distinguishable:

> However, it is *Brewster* that is distinguishable.  In
> *Brewster*, we decided that qualified immunity was
> warranted because the particular balance of free speech
> and workplace disruption in that case was both
> unprecedented and too close to call to say it was
> clearly established.  But unlike this case, the
> government employer in *Brewster* pointed to testimony in
> the record where other employees stated that Brewster's
> allegations of falsified attendance records had caused
> disruption at the workplace.

*Keyster*, 265 F.3d at 749.  Here the record does not demonstrate a

close call in the balancing between free speech and workplace

disruption because, given the subject of Plaintiff's expression,

the free speech interest is clearly strong while only a *potential*

for disruption has been alleged.  Thus, *Brewster* is also

distinguishable from this case.

Whistleblowing speech "is a particular kind of speech on

matters of public concern.  It was already the law of this

circuit in 1993 that the state's legitimate interest in workplace

efficiency and avoiding workplace disruption does not weigh as

heavily against whistleblowing speech as against other speech on

matters of public concern."  *Rivero v. City and County of San

Francisco*, 316 F.3d 857, 866 (9th Cir. 2002).  Moreover, in

holding that it was clearly established that a plaintiff's

criticisms of the VA for wastefulness and ethical and statutory

violations outweighed the VA's interests, the Ninth Circuit in

*Roth* stated: "[a]n employee who accurately exposes rampant

corruption in her office no doubt may disrupt and demoralize much

of the office. But it would be absurd to hold that the First

Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office."  856 F.2d at 1407-08.

Plaintiff's speech in this case can be classified as whistleblowing in that he sought to expose waste, unethical behavior, mismanagement and safety violations.  Plaintiff's warning to city council members about the polluted well, water rate study, and associated health risks is analogous to the VA doctor's accusations of waste, ethical and safety violations, and mismanagement in *Roth*.  For purposes of a Rule 12(c) motion, on the record before the court, the strong interest in Plaintiff's whistleblowing speech related to public health and safety and operation of Livingston's government plainly outweighs the City's potential disruption to the workplace and this was clearly established under Ninth Circuit authority when Plaintiff was terminated.

Defendants' motion for partial judgment on the pleadings on the ground of qualified immunity is DENIED.


**B.   California Constitution article I, §§ 2 and 3**

Defendants argue that Plaintiff cannot sustain a claim for damages under article I, §2 and § 3 of the California Constitution as a matter of law, because no private right to damages exists.  (Doc. 10 at 11.)  In *Katzberg v. Regents of the University of California*, 29 Cal. 4th 300, 303 (2002), the California Supreme Court considered:

[W]hether an individual may bring an action for money

> damages on the basis of an alleged violation of a
> provision of the California Constitution, in the
> absence of a statutory provision of an established
> common law tort authorizing such a damage remedy for
> the constitutional violation.

*Katzberg* provided a framework to guide courts in deciding whether a constitutional tort for damages will be recognized under any given constitutional provision.

> First, [the court] shall inquire whether there is
> evidence from which [the court] may find or infer,
> within the constitutional provision at issue, and
> affirmative intent either to authorize or to withhold a
> damages action to remedy a violation.

> [In deciding this factor, the court looks to] the
> language and history of the constitutional provision at
> issue, including whether it contains guidelines,
> mechanisms, or procedures implying a monetary remedy,
> as well as any pertinent common law history.

> Second, if no affirmative intent either to authorize or
> to withhold a damages remedy is found, [the court]
> shall undertake the 'constitutional tort' analysis
> adopted by *Bivens* [*v. Six Unknown Fed. Narcotics
> Agents*, 403 U.S. 388 (1971)] and its progeny.

> [In deciding the second prong] the relevant factors
> [include] whether an adequate remedy exists, the extent
> to which a constitutional tort action would change
> established tort law, and the nature and significance
> of the constitutional provision.

> [Finally,] <u>[i]f [the court] find[s] that these factors
> militate against recognizing the constitutional tort,
> our inquiry ends</u>. If, however, [the court] find[s]
> that these factors favor recognizing a constitutional
> tort, we also shall consider the existence of any
> special factors....

*Id.* at 317 (emphasis added). Although Plaintiff opposes Defendants' position that no damages remedy is available under article I, §§ 2 and 3, Plaintiff argues, in the alternative, that the complaint also seeks injunctive relief. (Doc. 15 at 6.)

*Katzberg* maintained that most constitutional provisions,

including article I, §§ 2 and 3, support "an action, brought by a private plaintiff against a proper defendant, for declaratory relief or for injunction." *Id.* at 307 (citing *Skelly v. State Pers. Bd.*, 15 Cal. 3d 194 (1975)); *see also Degrassi v. Cook*, 29 Cal. 4th 333, 338 (2002) (citing *Katzberg*, 29 Cal. 4th at 307).

With respect to Plaintiff's claim under article I, §§ 2 and 3, the complaint only seeks damages. (Compl. ¶ 32.) However, the complaint includes a general request for Plaintiff's reinstatement to his position in the prayer for relief. (Compl. at 17.) Because it is unclear whether Plaintiff seeks injunctive or declaratory relief with regard to this claim, Defendant's motion for partial judgment on the pleadings is GRANTED WITH LEAVE TO AMEND as to equitable relief. The motion is GRANTED WITH PREJUDICE as to the damages claim for the reasons discussed below.

### 1. *Article I, § 2*

Article I, § 2 of the California Constitution states that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. art. I, § 2.

Defendants argue that they are entitled to judgment on the pleadings with regard to Plaintiff's article I, § 2 claim because this provision of the California Constitution does not allow a private right of action for damages. (Doc. 10 at 11.) Defendants rely on *Degrassi v. Cook*, 29 Cal. 4th 333, 335 (2002),

the companion case to *Katzberg*, where the California Supreme Court considered whether article I, § 2(a) provided such a remedy. *Id.* Plaintiff, however, argues that *Degrassi* is not determinative because the court declined to recognize a constitutional tort action for damages under article I, § 2(a) in the specific circumstances that case presented: a city council member who claimed interference with her functioning and effectiveness as a legislator. (Doc. 15 at 6.) Plaintiff argues the reasoning in *Degrassi* should not apply to this case. (*Id.*)

However, "[t]he task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco*, 615 F.2d 857, 861 (9th Cir. 1980). In doing so, federal courts are bound by the pronouncement of the state's highest court on applicable state law. *Davis v. Metro Prod., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989); *see also Golden West Ref. Co. v. Suntrust Bank*, 538 F.3d 1233, 1237 (9th Cir. 2008). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986), *modified at* 810 F.2d 1517 (9th Cir. 1987). In assessing how a state's highest court would resolve a state law question - absent controlling state authority - federal courts look to existing law without predicting potential changes in that law. *Moore v. R.G. Indus., Inc.*, 789 F.2d 1326, 1327 (9th Cir. 1986).

*Degrassi* applied the *Katzberg* framework to article I, § 2(a) and concluded that the provision did not provide a remedy for damages. *Degrassi*, 29 Cal. 4th at 344. The court, however, limited its holding and stated that the present case did "not mean that the free speech clause, in general, never will support an action for money damages." *Id.* Nevertheless, *Degrassi* provides decisional law regarding the application of the *Katzberg* framework to an article I, § 2 claim and the district court is bound by *Degrassi*.

*Degrassi* first looked to the express language of article I, § 2 to determine whether it provided a remedy in damages. *Id.* The court concluded that "the words of [article I, § 2] do not explicitly disclose an intent either to authorize or to withhold damages as a remedy for violation of the provision." *Id.* at 339.

The court then considered whether article I, § 2 intended to provide one. *Id.* In doing so, the court reviewed the available drafting history of the constitutional provision, ballot materials from the provisions amendment in 1974, and common law history to determine whether a damages remedy should be implied. *See id.* at 339-42. The court concluded that "there is no indication in the language of article I, section (2)(a), nor any evidence in the history of that provision, from which [the court] may find, within that provision, an implied right to seek damages for a violation of the free speech right set out therein." *Id.* at 342.

After concluding that article I, § 2 neither expressly nor impliedly provided a remedy in damages, the court considered the

**29**

second prong of the *Katzberg* framework and determined the first two factors under the second prong - the existence of adequate alternative remedies and the extent to which a constitutional tort action would change established tort law - "militate against recognition of a constitutional tort action."  *Id.* at 342-43. Regarding the third factor, the nature and significance of the constitutional provision, the court stated that while "the free speech clause reflects an important and fundamental interest," that factor alone "is not a factor of great significance."  *Id.* at 343.  *Degrassi* specifically found that the third factor is not of great significance "when the considerations mentioned above do not militate in favor of recognizing a constitutional tort action."  *Id.*  The final factor considered under the second prong is "whether any special factors would counsel hesitation" in recognizing a damages action.  *Katzberg*, 29 Cal. 4th at 329.

Once the court determines that the factors preceding the special factors "militate against recognizing the constitutional tort, [the] inquiry ends."  *Id.* at 317.  A court only considers "the existence of any special factors" when the other factors favor recognition of a constitutional tort.  *Id.*  Despite the fact that all of the previous factors the court analyzed militated against recognizing a damages remedy under Article I, § 2(a), *Degrassi* nonetheless proceeded to analyze the "special factors," *Degrassi*, 29 Cal. 4th at 343:

> But even if we were, at this point in our analysis, inclined toward recognizing a constitutional tort action for damages in the case before us, a final factor would counsel strongly against - and on the facts alleged, preclude - recognition of such an

30

action.

The court concluded "the loss of damage of which plaintiff here complains - interference with her functioning and effectiveness as a legislator - does not support recognition of a constitutional tort for damages."  *Id.* at 344.

Here, no special factors exist.  There are no practical problems of proof or difficulty in ascertaining damages like in *Degrassi*.  Thus, *Degrassi*'s application of all of the *Katzberg* factors controls.  *Degrassi* found no express or implied legislative intent to authorize a damages remedy for a violation of article I, § 2(a) and also determined that no factors supported the conclusion that the court should recognize a constitutional tort action.  As in *Degrassi*, there is no reason to recognize a constitutional tort under the circumstances of this case.

Defendants' motion for partial judgment on the pleadings is GRANTED WITH PREJUDICE with regard to the damages claim. Plaintiff is GRANTED LEAVE TO AMEND as to equitable relief.

    2.    *Article I, § 3*

Defendants also challenge Plaintiff's article I, § 3 claim. (Doc. 10 at 11.)  Article I, § 3 provides: "[t]he people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."  Cal. Const. art. I, § 3.  Defendants argue that no California court has addressed whether article I, § 3 provides a remedy in damages.

The district court "may decline to exercise supplemental jurisdiction over a claim if . . . the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). "The decision to exercise supplemental jurisdiction is within the discretion of the district court." *Fang v. U.S.*, 140 F.3d 1238, 1244 (9th Cir. 1998).

In *Khatib v. County of Orange*, No. SACV07-1012DOC(MLGx), 2008 WL 822562, at *11 (C.D. Cal. Mar. 26, 2008), the plaintiff brought an action alleging that the defendant violated his rights under article I, § 4 of the California Constitution. The district court did not apply the *Katzberg* analysis to article I, § 4. *Id.* *Khatib* explained, "[t]he California Courts have not yet addressed whether such a private suit for monetary damages is available under Article I, Section 4." *Id.* The issue presented "a matter of first impression under California law." *Id.* The district court declined supplemental jurisdiction:

> In addition to being a matter of first impression, and therefore novel, the determination of whether a private action for money damages exists also appears complex.

*Id.*

As in *Khatib*, whether § 3 provides for a damages remedy has not been addressed by California courts, presenting a novel issue which need not be reached considering the complexities of the *Katzberg* framework and an existing available remedy. This issue is best left to the California courts.

Defendants' motion for partial judgment on the pleadings is GRANTED WITH PREJUDICE with regard to the damages claim. Plaintiff is GRANTED LEAVE TO AMEND as to equitable relief.

**C.   California Labor Code § 98.6**

     Plaintiff claims that Livingston terminated his employment

as Public Works Director in violation of California Labor Code

§ 98.6, which prohibits an employer from discharging an employee

for engaging in certain conduct.  (Compl. ¶ 8.)  Livingston

argues that the complaint fails to allege Plaintiff was engaged

in conduct protected by § 98.6.  (Doc. 10 at 16.)

Section 98.6, subdivision (a) provides:

>          No person shall discharge an employee or in any manner
>          discriminate against any employee or applicant for
>          employment because the employee or applicant engaged in
>          any conduct delineated in this chapter, <u>including the
>          conduct described in subdivision (k) of Section 96</u>, and
>          Chapter 5 (commencing with Section 1101) of Part 3 of
>          Division 2, or because the employee or applicant for
>          employment has filed a bona fide complaint or claim or
>          instituted or caused to be instituted any proceeding
>          under or relating to his or her rights, which are under
>          the jurisdiction of the Labor Commissioner, or because
>          the employee has initiated any action or notice
>          pursuant to Section 2699, or has testified or is about
>          to testify in any such proceeding or because of the
>          exercise by the employee or applicant for employment on
>          behalf of himself, herself, or others of any rights
>          afforded him or her.

Cal. Lab. Code § 98.6 (emphasis added).

     California Labor Code § 96(k) incorporates "lawful conduct

occurring during nonworking hours away from the employer's

premises" into § 98.6(a).  The complaint alleges that Plaintiff

engaged in the lawful conduct of exercising his free speech

rights in discussing the polluted well issues with the City's

mayor pro tem and council member.  (Compl. ¶ 35.)  The complaint

also alleges that the discussions occurred "during off-duty time"

and away from Livingston owned property.  (Compl. ¶ 21.)

Accepted as true, these allegations facially establish that the

33

conduct engaged in by Plaintiff falls within the conduct
contemplated by § 98.6.

Livingston contends that Plaintiff failed to allege that "he
filed a bona fide claim with the Labor Commissioner," arguing
such a step is required under California law prior to filing a
lawsuit.  (Doc. 10 at 16.)  Plaintiff challenges Livingston's
allegation as unsupported by legal authority.  (Doc. 15 at 11.)
Neither party cites relevant authority establishing that § 98.6
does or does not require exhaustion of administrative proceedings
prior to filing a lawsuit.

California Labor Code § 98(a) provides that "[t]he Labor
Commissioner shall have the authority to investigate employee
complaints" and grants the Labor Commissioner the authority to
"determine all matters arising under his or her jurisdiction."
Moreover, California Labor Code § 98.7(a) states that "[a]ny
person who believes that he or she has been discharged or
otherwise discriminated against in violation of any law under the
jurisdiction of the Labor Commissioner may file a complaint with
the division," providing an administrative remedy.  California
law generally provides: "[W]here an administrative remedy is
provided by statute, relief must be sought from the
administrative body and this remedy exhausted before the courts
will act."  *Campbell v. Regents of the Univ. of Cal.*, 35 Cal.4th
311, 321 (2005) (quoting *Abelleira v. Dist. Ct. of Appeal*, 17
Cal.2d 280, 292 (1941)) (internal quotations omitted).
"Exhaustion of administrative remedies is a jurisdictional
prerequisite to resort to the courts."  *Campbell,* 35 Cal.4th at

321 (quoting *Johnson v. City of Loma Linda*, 24 Cal.4th 61, 70 (2000)) (internal quotations omitted).  The doctrine of exhaustion of administrative remedies is a well-established rule of California jurisprudence that "is not a matter of judicial discretion, but is a fundamental rule of procedure...binding upon all courts."  *Abelleira*, 17 Cal.2d at 293.

Section 98.7 prescribes an administrative remedy for persons discharged or discriminated against in violation of any law under the jurisdiction of the Labor Commissioner.  Section 98.6 falls within the Labor Commissioner's jurisdiction.  *See* Cal. Lab. Code §§ 21, 79.  Accordingly, section 98.6 is subject to section 98.7's administrative exhaustion provision.  Because under California law an administrative remedy that is provided by statute must be exhausted prior to resort to the courts, Plaintiff is required to first exhaust his section 98.6 claim administratively.  *See Hall v. Apartment Inv. & Mgmt. Co.*, No. 08-CV-3447 CW, 2008 WL 5396361, at *10 (N.D. Cal. Dec. 19, 2008) (determining § 98.7's administrative exhaustion requirement applies to § 98.6); *Neveu v. City of Fresno*, 392 F.Supp.2d 1159, 1179-80 (E.D. Cal. 2005) (considering § 98.6 as within the purview of § 98.7 and requiring exhaustion of administrative remedies with the Labor Commissioner prior to filing suit that asserts a § 1102.5 claim).

Plaintiff argues that the complaint sufficiently alleges that all administrative remedies have been exhausted.  (Doc. 15 at 11.)  The complaint states: "Prior to commencing this lawsuit, [Plaintiff] complied with the California Tort Claims Act and he

35

exhausted all applicable administrative remedies." (Compl. ¶ 24.) However, Livingston argues that aside from this "conclusory allegation . . . Plaintiff has not alleged any facts showing that he filed a complaint with the Labor Commissioner prior to filing his lawsuit." (Doc. 17 at 2, Defendant's Reply, filed Mar. 2, 2009.)

To properly allege exhaustion of administrative proceedings, a plaintiff must articulate facts supporting his or her allegation that the relevant administrative remedies have been exhausted. *See Bowman v. Yolo County*, No. 2:08-cv-00498-GEB-EFB, 2008 WL 3154691, at *2 (E.D. Cal. Aug. 4, 2008) (finding that the plaintiff failed to allege facts supporting exhaustion of administrative remedies with the Labor Commissioner). Under Fed. R. Civ. P. 8(a)(2), a complaint requires at least some factual allegation to provide "a short and plain statement of the claim showing that the pleader is entitled to relief:"

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Here, Plaintiff states only the conclusion of law that "he exhausted all applicable administrative remedies." Plaintiff has alleged no facts that he filed a claim with the Labor Commissioner prior to commencing this suit, as required for administrative exhaustion under § 98.6.

Livingston's motion for partial judgment on the pleadings is **GRANTED WITH LEAVE TO AMEND** with regard to Plaintiff's claim under Cal. Lab. Code § 98.6.

## D.  California Labor Code § 1102.5

Livingston argues that Plaintiff has not pled that he exhausted his administrative remedies under California Labor Code § 1102.5.  Cal. Lab. Code § 1102.5 prohibits an employer from retaliating against an employee when the employee discloses information to a government or law enforcement agency under a reasonable belief that the information discloses a violation or noncompliance with state or federal statutes, rules, or regulations.  Additionally, the employer may not retaliate when an employee refuses to participate in the violating activity or where the employee exercised such rights in any former employment.  *Id.*  In *Campbell v. Regents of the Univ. of Cal.*, the California Supreme Court held that under § 1102.5, a plaintiff is required to exhaust all administrative remedies before proceeding to suit.  35 Cal.4th at 317, 329.

Livingston argues that Plaintiff has not satisfied the jurisdictional prerequisite of exhausting all administrative remedies before the Labor Commissioner.  (Doc. 10 at 16.)  Livingston cites *Neveu v. City of Fresno*, 392 F.Supp.2d 1159, 1180 (E.D. Cal. 2005), where a similar challenge was raised.  There, the defendant challenged the plaintiff's § 1102.5 claim, arguing that the Labor Commissioner had exclusive jurisdiction over such claims.  Applying *Campbell*, 35 Cal.4th at 333, *Neveu*

37

concluded that the Labor Commissioner's jurisdiction was not exclusive and that the plaintiff was required to exhaust available administrative remedies before the Labor Commissioner prior to filing suit. *Neveu*, 392 F.Supp.2d at 1180. Because the plaintiff failed to allege that the administrative remedies were exhausted, the defendant's motion to dismiss was granted for lack of jurisdiction. *Id.*

Plaintiff attempts to distinguish this case from *Neveu* by arguing that he has alleged that he has exhausted available administrative remedies. (Doc. 15 at 11.) The complaint states: "Prior to commencing this lawsuit, [Plaintiff] complied with the California Tort Claims Act and he exhausted all applicable administrative remedies." (Compl. ¶ 24.) Livingston contends that this allegation is insufficient because: (1) merely alleging compliance with the Tort Claims Act does not satisfy the exhaustion requirement with the Labor Commissioner, and (2) the allegation does not specifically mention that the administrative remedies available with the Labor Commissioner were exhausted. Livingston cites *Bowman,* 2008 WL 3154691, at *2, where the court concluded that "the filing of a Tort Claims Act claim does not satisfy the purposes of the exhaustion of administrative remedies requirement" for a § 1102.5 claim.

*Bowman's* determination is buttressed by the fact that section 98.7's administrative remedy requires the filing of a complaint with the Labor Commissioner, a requirement distinct from the mandate under the Tort Claims Act to file a claim with the public entity. Even independent of the Tort Claims Act

allegation, Plaintiff argues that he properly alleged "exhaust[ion] [of] all applicable administrative remedies." (Compl. ¶ 24.) This sole conclusory allegation is not sufficient to support a § 1102.5 claim. Because a § 1102.5 claim contains the same exhaustion prerequisite as a § 98.6 claim, Plaintiff has failed to allege any facts to support a finding that the proper administrative remedies have been exhausted, despite his use of the term "all." *See Hall*, 2008 WL 5396361, at *4 ("[E]xhaustion of the administrative remedies prescribed in § 98.7 applies to §§ 1102.5 and 98.6."); *Bowman,* 2008 WL 3154691, at *2 ("Since Plaintiffs have failed to allege facts showing they exhausted applicable administrative remedies, their section 1102.5 claim must be dismissed."); *Lund v. Leprino Foods Co.*, No. CIV. S-06-0431, 2007 WL 1775474, at *4 (E.D. Cal. June 20, 2007) ("[I]n order to bring a claim under section 1102.5 or 6310, plaintiff must exhaust his administrative remedies.").

Livingston's motion for partial judgment on the pleadings is GRANTED WITH LEAVE TO AMEND with regard to Plaintiff's § 1102.5 claim.

E.     California Labor Code § 6310

Livingston challenges Plaintiff's claim pursuant to California Labor Code § 6310, arguing that this section does not apply to the alleged facts.[2] (Doc. 10 at 17.)

_____

[2] At oral argument, Defendants argued that § 6310 is also subject to the same administrative exhaustion requirement as § 98.6 and § 1102.5. Applying the reasoning in *Campbell*, 35

California Labor Code § 6310 prohibits an employer from discharging an employee for complaining of unsafe working conditions. It provides, in its entirety:

> (a) No person shall discharge or in any manner discriminate against any employee because the employee has done any of the following:
>
> > (1) Made any oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division <u>with reference to employee safety or health, his or her employer, or his or her representative</u>.
> >
> > (2) Instituted or caused to be instituted any proceeding under or relating to his or her rights or has testified or is about to testify in the proceeding or because of the exercise by the employee on behalf of himself, herself, or others of any rights afforded him or her.
> >
> > (3) Participated in an occupational health and safety committee established pursuant to Section 6401.7.
>
> (b) Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative, <u>of unsafe working conditions, or work practices, in his or her employment or place of employment</u>, or has participated in an employer-employee occupational health and safety committee, shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. Any employer who willfully refuses to rehire, promote, or otherwise restore an employee or former employee who has been determined to

Cal.4th at 321, § 6310 is also subject to the exhaustion requirement. *See also Lund v. Leprino Foods Co.*, No. CIV. S-06-0431-WBS-KJM, 2007 WL 1775474, at *3-4 (E.D. Cal. June 20, 2007) (finding that "in order to bring a claim under section 1102.5 or 6310, plaintiff must exhaust his administrative remedies").

> be eligible for rehiring or promotion by a grievance
> procedure, arbitration, or hearing authorized by law,
> is guilty of a misdemeanor.

Cal. Lab. Code § 6310 (emphasis added).

Livingston argues that § 6310 applies only to workplace safety issues and Plaintiff's complaint does not allege facts to support that workplace safety was at issue. (Doc. 10 at 17.) Rather, Plaintiff's complaint alleges that "the City retaliated against him for questioning Mr. Warne's management of the City's water fund, the legitimacy of change orders for a water line replacement project, the timing of a water rate study, and expressing concerns regarding potential well contaminants," assertions that Livingston contends are unrelated to the safety of working conditions. (*Id.* at 17-18.)

Plaintiff argues that the complaint sufficiently establishes a § 6310 claim because § 6310 is broadly construed, citing *Cabesuela v. Browning-Ferris Industries of California, Inc.*, 68 Cal.App.4th 101, 109 (1998). (Doc. 15 at 11.) In that case, the plaintiff, a truck driver, alleged that the defendant terminated his employment for complaining about long driving hours, which he believed posed a hazard to the employee truck drivers and others. *Id.* at 108-09. The court determined that this allegation was sufficient to withstand a demurrer to the § 6310 claim because the plaintiff reasonably believed that the working conditions - driving long hours - were unsafe. *Id.* at 109.

This case is distinguishable from *Cabesuela*. Unlike *Cabesuela*, where driving long hours was alleged to create unsafe working conditions for defendant's employee truck drivers,

Plaintiff does not allege any facts indicating that he was exposed to "unsafe working conditions, or work practices, in his . . . employment or place of employment" as required under § 6310(b) or make assertions related to "employee safety or health" under § 6310(a)(1).  Plaintiff alleges that the hazard of contaminated water posed a public health risk to the residents of the City of Livingston and users of its water supply.  (Compl. ¶ 46.)  This risk, although public in nature, does not satisfy § 6310's requirement that the employee complain of unsafe working conditions or an unsafe workplace.  *See Lujan v. Minagar*, 124 Cal.App.4th 1040, 1043 (2004) ("Section 6310 makes it unlawful to fire or otherwise retaliate against an employee who makes a workplace safety complaint with government agencies.").

Plaintiff further argues that the alleged facts create numerous inferences that support a § 6310 claim, including: Plaintiff "may have believed that City employees could be exposed to contaminated water while working in Livingston; that [Plaintiff] may have made complaints to government agencies about the water quality; or even that Warne fired [Plaintiff] because he believed [Plaintiff] may complain about those issues in the future."  (Doc. 15 at 12.)  None of these inferences support a conclusion that Livingston maintained a hazardous or unsafe working environment for Plaintiff, comparable to *Cabesuela*.

Livingston's motion for partial judgment on the pleadings is GRANTED WITH LEAVE TO AMEND as to Plaintiff's § 6310 claim.

**42**

**F.**    <u>**Wrongful Termination In Violation of Public Policy**</u>

Livingston argues that Plaintiff's claim for wrongful termination in violation of public policy is barred by the Tort Claims Act, California Government Code § 810 et seq.  (Doc. 10 at 18.)  Plaintiff does not oppose Livingston's argument.

In *Miklosy v. Regents of the University of California*, 44 Cal.4th 876, 899 (2008), the California Supreme Court considered whether the Tort Claims Act barred the plaintiff's common law claim of wrongful termination in violation of public policy (or "*Tameny* claim").[3]  *Miklosy* observed that the Tort Claims Act "abolishes all common law or judicially declared forms of liability for public entities."  *Id.* at 899 (quoting Legislative Committee comment, West's Ann. Gov. Code § 815, p. 167 (1995)) (italics and internal quotations omitted).  The court determined that because a *Tameny* claim is a common law cause of action, and the Tort Claims Act abolishes common law tort liability for a public entity, the Tort Claims Act bars a *Tameny* claim against a public entity.  *Id.* at 899-900.

Here, Plaintiff's sixth cause of action asserts the common law tort of wrongful termination in violation of public policy

_____

[3]  In *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 170 (1980), the California Supreme Court stated: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions," creating a common law tort cause of action.  The cause of action must be "carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions." *Miklosy,* 44 Cal.4th at 898 (quoting *Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 1095 (1992)).

against Livingston, a municipality.  Because Livingston is a public entity, Plaintiff's sixth cause of action is barred by the Tort Claims Act.

Livingston's motion for partial judgment on the pleadings is **GRANTED WITH PREJUDICE** as to Plaintiff's sixth claim for wrongful termination in violation of public policy.

## G.   California Tort Claims Act Claim Presentation Requirement

The district court considers, *sua sponte*, whether Plaintiff's conclusory allegation that he "complied with the California Tort Claims Act" is sufficiently pleaded for purposes of the Tort Claims Act, California Government Code § 810 et seq., as it raises a jurisdictional issue.  (Compl. ¶ 24.)

The California Tort Claims Act requires that "all claims for money or damages against local public entities" or public employees acting within the scope of that employee's public employment must be presented to the employer.  Cal. Gov. Code §§ 905, 950.2.  "[N]o suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefor has been presented to the public entity and has been acted upon . . . or has been deemed to have been rejected."  Cal. Gov. Code § 945.4; *see Maynard v. City of San Jose*, 37 F.3d 1396, 1406 (9th Cir. 1994) (stating that Tort Claims Act requirements apply to public employees as well); *Wilson-Combs v. Cal. Dep't of Consumer Affairs*, 555 F.Supp.2d 1110, 1118 (E.D. Cal. 2008) (same); *Julian v. City of San Diego*, 183 Cal.App.3d 169, 175 (1986) (same).

**44**

1    Presentation of a timely tort claim is a jurisdictional

2   prerequisite to maintaining a cause of action against a public

3   entity.  *Ard v. County of Contra Costa*, 93 Cal.App.4th 339, 343

4   (2001); *see also Hernandez v. McClanahan*, 996 F.Supp. 975, 977

5   (N.D. Cal. 1998).  A plaintiff's supplemental state law claims

6   against a California public agency are barred unless the

7   plaintiff has complied with the requirements of the Tort Claims

8   Act before commencing a civil action.  *See Mangold v. Cal. Pub.*

9   *Util. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995).

10    The timely presentation of a claim under the Tort Claims Act

11   is not merely a procedural requirement but is an actual "element

12   of the plaintiff's cause of action."  *Shirk v. Vista Unified Sch.*

13   *Dist.*, 42 Cal.4th 201, 209 (2007).  In the complaint, the

14   plaintiff "must allege facts demonstrating or excusing compliance

15   with the claim presentation requirement.  Otherwise his complaint

16   . . . fail[s] to state facts sufficient to constitute a cause of

17   action."  *State v. Superior Court (Bodde)*, 32 Cal.4th 1234, 1243

18   (2004); *see also Shirk*, 42 Cal.4th at 209.

19    Here, Plaintiff's complaint states the legal conclusion that

20   he "complied with the California Tort Claims Act."  (Compl.

21   ¶ 24.)  Under *Twombly*, while a complaint need not contain

22   detailed factual allegations under Fed. R. Civ. P. 8(a), it must

23   contain sufficient factual allegations "to raise a right to

24   relief above the speculative level."  550 U.S. at 555.  Plaintiff

25   alleges no facts supporting his conclusory assertion that the

26   Tort Claims Act jurisdictional requirement has been met.

27   Accordingly, Plaintiff's complaint fails to state facts

28

**45**

sufficient to constitute a cause of action against Livingston with respect to his state law tort claim.

Plaintiff's *Tameny* claim against Livingston has already been dismissed with prejudice because the Tort Claims Act bars such a claim against a public entity. Accordingly, Plaintiff's *Tameny* claim is also dismissed on the alternative basis that Plaintiff has failed to plead that he met the claim presentation jurisdictional prerequisite of the Tort Claims Act.

## V. CONCLUSION

For the foregoing reasons:

(1) Defendant Livingston's motion for partial judgment on the pleadings as to Plaintiff's *Monell* claim is GRANTED WITH LEAVE TO AMEND;

(2) Defendants' motion for partial judgment on the pleadings on the ground of qualified immunity is DENIED;

(3) as to the state constitutional damages claims, Defendants' motion for partial judgment on the pleadings is GRANTED WITH PREJUDICE;

(4) Plaintiff is GRANTED LEAVE TO AMEND the state constitutional claims as to equitable or injunctive relief;

(5) as to Plaintiff's claims under California Labor Code §§ 98.6, 1102.5, and 6310 against Livingston, Defendant's motion for partial judgment on the pleadings is GRANTED WITH LEAVE TO AMEND;  and

(6) as to Plaintiff's sixth claim for wrongful

termination in violation of public policy, Defendant Livingston's motion for partial judgment on the pleadings is GRANTED WITH PREJUDICE.

Any amended complaint shall be filed within fifteen (15) days following electronic service of this decision.

IT IS SO ORDERED.

Dated: __May 18, 2009__                    _____/s/ Oliver W. Wanger_____
                                           UNITED STATES DISTRICT JUDGE